JUDGE FURMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 0556

------------------------------------------------------------------x

NORTHERN YIELD SHIPPING LIMITED,

                Plaintiff,

      -v-

NATIONAL OIL CORPORATION,

                Defendant.

------------------------------------------------------------------x

13 CV

ADMIRALTY

JAN 2 4 2013

**VERIFIED COMPLAINT**

Plaintiff, NORTHERN YIELD SHIPPING LIMITED (hereinafter "NORTHERN YIELD" or "Plaintiff"), by undersigned counsel, CHALOS & CO, P.C., for its Verified Complaint against Defendant NATIONAL OIL CORPORATION (hereinafter "NOC" or "Defendant"), alleges and pleads as follows:

## I. JURISDICTION, VENUE AND PARTIES

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for the breach of a maritime contract, *i.e.*, a time charter party for the employment of a seagoing cargo vessel. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is brought under the provision of Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

2.     At all times material hereto Plaintiff NORTHERN YIELD, is a corporation organized under the laws of Cyprus and the registered owner of the LPG/C GAS LEGACY, a

Liquid Petroleum Gas Carrier vessel registered in Cyprus with IMO number 9186948 and international call sign C4EL2 (hereinafter also "the vessel").

3.     At all times material hereto Defendant, NOC, was and is a foreign company organized under the laws of Libya and is entirely owned and controlled by the sovereign state of Libya.   NOC is in the business of oil and gas exploration and production, and marketing operations of oil and gas domestically (in Libya) and abroad.  In carrying on its business, NOC operates directly, or through various subsidiary companies, or in collaboration with specialized international companies.

4.     The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendant that may be attached by process of maritime attachment and garnishment under the provisions of Rule B of the Supplemental Rules for Admiralty or Maritime Claims, as pled in Section IV of this Verified Complaint.

## II. EXEMPTION FROM SOVEREIGN IMMUNITY

5.     Plaintiff's claims arise from a contract, a charter party agreement dated December 19, 2012 between Plaintiff NORTHERN YIELD, as owner of the vessel, and Defendant NOC, as charterer.  The voyage charter agreement made through chartering broker channels is evidenced by: an e-mail confirmation of the fixture with standard Asbatankvoy Charter Party to apply with NOC Terms and Conditions as attached to apply. A copy of the fixture recap with applicable terms and amendments is annexed hereto as **EXHIBIT 1.**

6.     Though NOC is a company owned by a foreign sovereign state, it has explicitly and by implication waived jurisdictional immunity from suit   in these proceedings under the provisions of the Foreign Sovereign Immunities Act (hereinafter "FSIA") set out at 28 USC § 1605(a) by, *inter alia*, entering in the charter party with Plaintiff which contains among others

explicit and implied waivers of sovereign immunity in the Amended ASBATANKVOY form (EXHIBIT 1 herein) as follows: (1) submission of merits disputes to maritime arbitration in London under English law and (2) reserving to the parties the right to arrest respective property to secure their claims under the charter party.

7.     Though NOC is a company owned by a foreign sovereign state, its property Plaintiff seeks to attach hereunder is not immune from attachment prior to judgment under FSIA as it is used for commercial activity in the United States such as making payment for commercial undertakings and/or obligations, including but not limited to the purchase of oil field services and equipment and petroleum products.  As this is an ancillary proceeding, the purpose of the attachment hereunder is to secure satisfaction of the anticipated arbitration award and not to obtain jurisdiction over Defendant for the adjudication of the merits of the dispute, which has been already agreed to under the forum selection clause of the time charter. *See* EXHIBIT 1.

### III.  FACTS AND CLAIM

8.     On or about December 19, 2012, NORTHERN YIELD as Owners and Defendant NOC, as Charterer, entered into a voyage charter party on an amended ASBATANKVOY form (hereinafter "the Charter Party").  The Charter Party stipulated the carriage by NORTHERN IELD of a cargo of "LPG Mix 25% Butane and 75% Propane." *See* EXHIBIT 1.

9.     The Vessel Particulars for the GAS LEGACY, known as "Form C", were provided to Defendant at the outset of negotiations and fully set forth the specifications and details of the type of cargo that the vessel could accommodate as a pressurized LPG carrier and was accepted by Defendant NOC in accordance with the terms of the parties' Charter Party.

10.     The Charter Party agreement is a maritime contract.

11.     The Charter Party was for "1 voyage + 1 voyage in chopt [Charterer's Option] to be declared latest upon arrival loadport on 1st firm voyage." *Id.* Defendant exercised the option for the second voyage and the agreed freight rate was USD 190,000 lumpsum for the first firm voyage and USD 170,000 lumpsum for the optional voyage.

12.     The Charter Party required Plaintiff to deliver the vessel into the Defendant's service within the agreed cancellation period ("laycan") which was between December 23 and December 26, 2012. *Id.*

13.     In accordance with the terms of the Charter Party, Plaintiff delivered the vessel to the nominated load port of Defendant at Ras Lanuf, Libya and provided notice of readiness for cargo operations on or about December 23, 2012.

14.     On December 26, 2012, Defendant NOC for the first time notified Plaintiff that the nominated cargo required a vessel with a "cargo reheater" which could receive cargo with a temperature of -18 degrees Celsius.

15.     However, at no point during the negotiations of the Charter Party did NOC request a vessel capable of loading and transporting cargo at such a temperature. In fact, the vessel's particulars (Form C) plainly confirmed that the GAS LEGACY was only able to load cargo with minimum temperature of 0 degrees Celsius and was not equipped with a cargo reheater. *See* EXHIBIT 1, Form C, Clause 3 and Clause 12 respectively.

16.     The GAS LEGACY was presented by Plaintiff, negotiated, and cleared by Defendant NOC with a Form C which clearly stated that the vessel had no reheater and could not accept cargo below a minimum temperature of 0 degrees Celsius.

17.     Defendant subsequently and in breach its obligations cancelled the voyage Charter Party.

4

18.     In consequence whereof, Plaintiff intends to pursue its claims against Defendant in London maritime arbitration as the time charter provides and will claim as damages:

| | | |
|---|---|---|
| A) | Freight for Two Voyages: | USD 355,500.00[1] |
| B) | Demurrage: | USD 37,083.33 |
| C) | Additional War Premium | USD 1,275.00 |

19.     Plaintiff intends to claim in the arbitration the full amount payable under the Charter Party, as noted in the foregoing, together with interest, costs, and legal fees which are recoverable under the rules governing maritime arbitration in London.  Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party.  Plaintiff estimates the legal costs that will be incurred to pursue its claims in London maritime arbitration proceedings will be approximately USD 100,000.

20.     Therefore, Plaintiff's claims as reasonably as can be estimated are as follows:

| | |
|---|---|
| Principal Claim (as set forth in ¶ 18)................... | USD 393,858.33 |
| Estimated Interest on Principal Claim ................. | USD 32,633.80 |
| Recoverable legal fees and costs........................ | USD 100,000.00 |
| **TOTAL** | **USD 526,492.30** |

## IV. APPLICATION FOR ATTACHMENT UNDER
## SUPPLEMENTAL ADMIRALTY RULE B

21.     Defendant is not present and cannot be found in the District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (*see* Declaration of Attorney Katherine Christodoulatos attached hereto as **EXHIBIT 2**),

---

[1] Representing the total freight for two (2) voyages, *i.e* USD 190,000 + USD 170,000 less 1.25% address commission.

but the Defendant has within the District tangible or intangible personal property in the hands of parties who may be named garnishees in the process of maritime attachment and garnishment comprised of debts, credits, or effects, including but not limited to bank accounts within this District, at Arab Banking Corporation and/or JPMorgan Chase Bank N.A., which may be holding, stocks, royalties, accounts, contractually agreed payments, debts, and other obligations payable, held in favor or to the order or for the benefit of the said Defendant.

22.    More particularly Defendant, to the best of Plaintiff's knowledge, has, as it represents in the public domain, Defendant NOC conducts banking operations and holds accounts in financial institutions such as Central Bank of Libya and Libyan Foreign Bank. *See* statements of NOC chairman Dr Nuri Buruwin to the Libya Herald, dated March 10, 2012, attached hereto as **EXHIBIT 3**.

23.    Arab Banking Corporation and JPMorgan Chase Bank N.A. are listed as affiliated and/or correspondent banks for the Libyan Foreign Bank (a copy of the screenshot Libyan Foreign Bank website is attached hereto as **EXHIBIT 4**), and upon information and belief, are likely to have bank accounts and/or property belonging to the said Defendant as part of Defendant NOC's banking partnership with these financial institutions.

24.    The said garnishees are located within the Southern District of New York, specifically, Arab Banking Corporation, has a branch office located at 600 3rd Avenue, New York, NY 10016, and JPMorgan Chase Bank N.A. located at One Chase Manhattan Plaza, 231 Grand Street New York, NY 10013.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays as follows:

A.      That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction issue against Defendant and said Defendant be cited to appear and answer the allegations of this Complaint;

B.      That if Defendant cannot be found within this district, then all of its respective property within this district, consisting of debts, credits, or effects including but not limited to royalties, accounts, contractually agreed payments, debts, and other obligations payable, in the hands of persons named garnishees in the Process of Maritime Attachment and garnishment be attached and seized pursuant to Supplemental Admiralty Rule B for Admiralty or  Maritime Claims and Asset Forfeiture Actions;

C.      That judgment be entered against the Defendant in the sum of **USD 526,492.30**, and the proceeds of the assets attached be applied in satisfaction thereof;

D.      That the Court grant such other and further relief as it deems, just, equitable and proper.

Dated: Oyster Bay, New York
        January 24, 2013

                           CHALOS & CO, P.C.
                           Attorneys for Plaintiff
                           NORTHERN YIELD SHIPPING LIMITED.

By:     *Katherine Christodoulatos*
                George M. Chalos (GC-8693)
                Briton P. Sparkman (BS-5220)
                Katherine N. Christodoulatos (KC-1226)
                55 Hamilton Avenue
                Oyster Bay, New York 11771
                Tel: (516) 714-4300
                Fax: (516) 750-9051
                Email: gmc@chaloslaw.com
                        bsparkman@chaloslaw.com
                        kchristodoulatos@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
NORTHERN YIELD SHIPPING LIMITED,

,
                                    Plaintiff,              13 CV

-v-
                                                    **VERIFICATION**

NATIONAL OIL CORPORATION,

                                    Defendant.
------------------------------------------------------------------x

      Pursuant to 28 U.S.C. §1746, KATHERINE CHRISTODOULATOS, Esq., declares under the penalty of perjury:

      1.    I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff, NORTHERN YIELD SHIPPING LIMITED, herein;

      2.    I have read the foregoing Verified Complaint and know the contents thereof; and

      3.    I believe the matters to be true based on documents and information obtained from employees and representatives of the Plaintiff through its agents, underwriters and attorneys.

      4.    The reason that this verification was made by deponent and not by the Plaintiff is because Plaintiff is a foreign corporation, whose officers are not in this district, and whose verification cannot be obtained within the time constraints presented by the circumstances of this case.

      I declare under penalty of perjury that the foregoing is true and correct.

1

Dated: Oyster Bay, New York
       January 24, 2013

                            CHALOS & CO, P.C.
                            Attorneys for Plaintiff
                            NORTHERN YIELD SHIPPING LIMITED

By:      _Katherine Christodoulatos_

                            George M. Chalos (GC-8693)
                            Briton P. Sparkman (BS-5220)
                            Katherine N. Christodoulatos (KC-1226)
                            55 Hamilton Avenue
                            Oyster Bay, New York 11771
                            Tel: (516) 714-4300
                            Fax: (516) 750-9051
                            Email: gmc@chaloslaw.com
                                    bsparkman@chaloslaw.com
                                    kchristodoulatos@chaloslaw.com

# EXHIBIT 1

**Briton Sparkman**

---

**Subject:**                              LPG/C Gas Legacy/NOC CP 19.12.2012 - Amended Clean Reacp

-----Original Message-----
From: isgas@steensland.com [mailto:isgas@steensland.com]
Sent: Wednesday, December 19, 2012 7:25 PM
To: isgas@steensland.com
Subject: LPG/C Gas Legacy/NOC CP 19.12.2012 - Amended Clean Reacp


JHG10296386

Inge Steensland A/S, Oslo   Gas Dept., 19.12.2012, 18:24:55
Phone: + 47 23 13 55 00    Email: isgas(at)steensland.com

Att:

TO : NOC
CO : Ocean Shipbrokers
Att : James & Paul

TO : Stealth
Att : Christian

* Amende clean recap
- H&M value
- Head owners


LPG/C Gas Legacy/NOC - CP 19.12.2012 Clean Recap
-------------------------------------------------
As agreed by both parties today we are pleased to recap following clean ficture with all subjects lifte today, CP 19.12.2012

Acct      : National Oil Corporation., Tripoli, Libya

Vessel    : Gas Legacy (form c attached)

Owner     : Northern Yield Shipping Limited, Cyprus

Voyage   : 1 voyage + 1 voyage in chopt to be declared latest  upon
              arrival loadport on 1st firm voyage

laycan    : 23-26 Dec 2012 (2359hrs cancelling)

Itinerary : ETS Barcelona 20th December AM/PM, ETA Ras Lanuf 24th
             December AM 2012

Cargo     : LPG Mix 25% Butane and 75% Propane

Owners advised that they can mix onboard 25% butane / 75% propane in the following order, butane parcel should be loaded first and then propane and then it will be mixed onboard.

max intake : abt 1750 mts

Load      : osp/osb out of ZUEITINA/ RAS LANUF / MARSA ELBEGA

1

Disch      : osp/osb out of TRIPOLI / MISURATA / BENGHAZI

Laytime   : 48hrs ttl shinc + 6 hours nor each port unless used (as
            per asbatankvoy)

Dem       : USD 12,500 pdpr

Freight   : USD 190,000 lumpsum  per voy for firm voyage
            USD 170,000 lumpsum per voy for optional voyage

Comm      : 1,25 pct address commission + 2pct brokerage to Ocean
            Shipbrokers Limited + 2pct brokerage to Inge Steensland
            on freight/dem/deviation

l/c       : Propane, Propane, Propane

Press     : Liquid free under vapours of last cargo

Load port 1st voy to be declared latest by 1800hrs London 20th Dec 2012.

Load port opt voy to be declared latest by completion of loading 1st voy.

ASBATANKVOY CP + NOC TERMS AND CONDITIONS AS ATTACHED WITH FLWG AMENDMENTS

Part One
--------

 1 - as per Gasform C
 2 - delete
 3 - see recap
 4 - delete
 5 - delete
 6 - 7 - 8 - as per main terms
 9 - delete
     pls confirm that payment in USD is ok now

10 - 11 - as per main terms

Part Two
--------

02 - after "1974" insert "1994"
03 - delete
04 - delete as WS not applicable
07 - delete as not applicable to Gas Tankers
08 - delete as not applicable to Gas Tankers (which have segregated
     ballast tanks)

09 - line 11 after "countersigned by receivers" insert (only if
     available)"

14 - delete "AND DEBALLASTING TIME" as not applicabel to Gas Tankers
     (which are deballasting concurrently to loading operations)

16 - 2ND LINE BEFORE "COST" INSERT "DIRECT AND PROVEN"

17 - after "by Charterers" insert "provided competitive" (as agreed in main terms)

20 - delete as not applicable to Gas Tankers (where no physical insopection is
     held in tanks)

2

21 - delete as not applicable to Gas Tankers (no heating)
22 - 2ND Line before "losses" and "damages" insert "DIRECT AND PROVEN"
23 - delete as not applicable to Gas Tankers (no COW)
24 - delete as not applicable to Gas Tankers (no access to tanks)
25 - delete as not applicable to Gas Tankers (no Zawia trading with
     hoses lifting equipment)

29 - delete as not applicable to Gas Tankers (no STS ops possible)
31 - 32  - 33 delete as no USA trading
34 - first line before "cargo" insert "liquid and pumpable"
       second line delte "deduct" insert "claim for deduction"

36 - delete as not applicable (vsl is trading)
38 - delete
39 - delete 2.50 (as agreed in main terms)
41 - delete as no Sarroch trading


OTHER TERMS - EXTRA WAR RISK IF ANY TO BE FOR CHRTS ACCOUNT (PRESENTLY SAME IS 0.025% ON VSLS' HULL AND MACHINERY INSURED VALUE US$ 22,500,000) TO BE SETTLED BY CHRTRS TOGHETHER WITH FREIGHT AGAINST SUPPORTING DOCUMENTATION INCLUDING COPY OF H+M INSURERS' INVOICE


Kindly note the following standard amendments to the blank Asbatankvoy Charter Party:

Part I

Clause L:       Delete
Part II
Clause1, line 5: Replace 'heater coils' by 'compressors'
Clause2, line 3: Insert after 'inspection' the words ' and
                 inserted in the Original Bills of Lading'
Clause3, line 1: Delete 'full' and add after 'cargo' the wording,
                 'as stipulated in Clause E'
         line 5: Insert after 'intake quantity' the wording ',as
                 inserted in the Original Bills of Lading,'
Clause5, line 2: Delete 'the vessel' and insert 'it become
                 evident that the vessel will'
               : Replace '4:00 o'clock P.M.' by '16:00 hours'
Clause6, line 5: Delete 'receipt of' and add after 'notice' was
                 sent by the master of the Owners` agents` Clause8, lines 1 & 8: Replace 'hour' by 'day'
Clause13      : Delete
Clause18, line3: Replace 'oil' by 'cargo'
Clause20 (iii) line 2: replace '1950' by '1994'
Clause26       : Delete all and insert 'Owners to have P & I
                 coverage for oil pollution.'

0,5% Loss Clause
-------------------------
Notwithstanding anything contained in this Charter Party,. Owners may not be responsible for any loss or shortage, provided that such losses or shortages will not exceed 0,5% of the loaded quantity, based on ship's figures in/out.


Weather Clause - Conoco Weather Clause
---------------------------------------------
Delays in berthing for loading or discharging and delays after berthing which are due to weather conditions shall count as on e half laytime or, if on demurrge at one half demurrage rate.

ISPS/MTSA Clause
---------------------------
(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner"
(as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:
(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.
(d) Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners'
account.
(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

8.) P & C Clause
-----------------
Terms of the negotiations and subsequent fixture to be kept always private and confidential by all parties concerned.

Add clause:

cancelling clause:
IF IT APPEARS THAT VESSEL WILL BE DELAYED BEYOND THE CANCELLING DATE OWNERS SHALL, AS SOON AS THEY ARE IN A POSITION TO STATE WITH REASONABLE CERTAINTY THE DAY ON WHICH THE VESSEL SHOULD BE READY, GIVE

NOTICE THEREOF TO CHARTERERS ASKING WHETHER CHARTERERS WILL EXERCISE THEIR OPTION OF CANCELLING, AND THAT OPTION MUST THEN BE DECLARED WITHIN 48 HOURS AFTER NOTICE IS SENT BY OWNERS.

-- End Clean Recap --

Thanks both parties for good efforts and support leading to this fixture.

Kind regards
Paul Simons
Ocean Shipbrokers Limited


This e-mail is confidential and may be privileged. It may be read, copied and used only by the intended recipient. If you have received it in error, please contact the sender immediately by return e-mail or by telephoning +218213615170. Please delete the e-mail and do not disclose its contents to any person. We believe, but do not warrant, that this e-mail and any attachments are virus free. You should take full responsibility for virus checking..

National Oil Corporation  is registered in Tripoli -libya.

Please consider your environmental responsibility before printing this e-mail.

[A Mime Part (Gas Legacy.pdf - attachment; filename="Gas Legacy.pdf"; size=154496;
      creation-date="Wed, 19 Dec 2012 19:22:42 GMT";
      modification-date="Wed, 19 Dec 2012 19:22:42 GMT") was detected here]

[A Mime Part (NOC Shipping Terms  Cond VOYAGE CPPDPP.doc - attachment;
      filename="NOC Shipping Terms  Cond VOYAGE CPPDPP.doc"; size=59392;
      creation-date="Wed, 19 Dec 2012 19:22:42 GMT";
      modification-date="Wed, 26 Dec 2012 13:01:28 GMT") was detected here]



      --------------- End of Message ---------------


++++


End

# VESSEL PARTICULARS (FORM C)
## LPG/C GAS LEGACY
### (last updated 29/02/2012)

Specifications of the vessel and the gas installation which are representations by the Owners.

**(A)   VESSEL'S CHARACTERISTICS**
**PREAMBLE**

| | | |
|---|---|---|
| Name | : | **GAS LEGACY** |
| Owner | : | **NORTHERN YIELD SHIPPING LIMITED** |
| Flag | : | **CYPRUS** |
| Build | : | **30/06/1998** |
| Date on Service | : | **21/12/1998** |
| Class | : | **LLOYD REGISTER** |

| | | | | | |
|---|---|---|---|---|---|
| GRT International | : | **3392** | Suez | : | **3720.01** |
| | | | Panama | : | **3392** |
| NRT International | : | **1018** | Suez | : | **2864.15** |
| | | | Panama | : | **2907** |

| | | |
|---|---|---|
| Is vessel build according to | USCG regulations? | : |
| | RINA regulations? | : |
| | Japanese regulation? | : |
| Has vessel received | USCG approval? | : |
| | RINA approval? | : |

**HULL**

| | | |
|---|---|---|
| LOA | : | **95.95M** |
| LBP | : | **88.79M** |
| Breadth | : | **16M** |
| Depth | : | **7.1M** |
| Summer Draft | : | **5.11M  corresponding to Summer DWT = 3318.81** |
| Multiple  Draft | : | **M  corresponding to Multiple  DWT =** |

Estimated draft with full cargo and full bunkers  are as follows.

| Product | Draft Fore' (m) | Draft Aft' (m) | Draft Mean (m) | Corresponding Deadweight (t) |
|---|---|---|---|---|
| Propane    (98%) | 4.26 | 5.28 | 4.77 | 2916 |
| Butadiene (98%) | 4.46 | 5.45 | 4.96 | 3146 |
| VCM        (98%) | 4.04 | 6.17 | 5.11 | 3318 |

**Propeller immersion :**

| | | | | | |
|---|---|---|---|---|---|
| At draft | At | 5,28  m correspond. | : | 150.86 % |
| At draft | At | 5.45  m correspond. | : | 155.71 % |
| At draft | At | 6.17  m correspond. | : | 176.29 % |

Form 'C' – TBA                           1

## COMMUNICATION EQUIPMENT

| | | | |
|---|---|---|---|
| Call letter | | : | C4EL2 |
| Radio Station normally watched | | : | GMDSS |
| Radio MF/HF NBDP | | : | FITTED |
| Radio MF/HFTEL/DSC | | : | FITTED |
| VHF | | : | FITTED |
| Satellite Communication | Inmarsat 'C' | : | FITTED – TELEX: 420908410 |
| | Inmarsat 'F' | : | FITTED - TEL: 764893651-2 |
| | | | FAX: 764893653 |
| | | : | EMAIL: gaslegacy@ship.rydex.com.sg |

## MACHINERY

| | | | |
|---|---|---|---|
| Main Engine x 1 | Type and make | : | 5UEC 33LSII & AKASAKA MITSUBISHI |
| | Service power | : | 3303 PS at 203 RPM |
| | No of Cylinders | | 5 CYLINDERS |
| | Cyl Bore x Stroke | | 330 mm x 1050 mm |
| | Grade of fuel used | : | HFO 380 CST |
| Auxiliaries | Type and make (Electrical) | | TAIYO ELECT CO.,LTD<br>3 PHASE / 500 KVA /450V<br>1200 RPM / 60 Hz |
| | (Mechanical) | | YANMAR DIESEL ENGINE CO.,LTD.<br>S165 L – EN ; 400 KW – 1200 RPM |
| | Grade of fuel used | | MGO |
| | No off | | 2 |
| Emergency Gen | Type | | YANMAR DIESEL CO.,LTD<br>NF 19-HF , 13 BHP / 1800 RPM (AUTO) |
| | No off | | 1 |
| Bow Thruster | Type :   Power: | | N/A |
| Boiler | Type<br>Evaporation<br>Max Design Pressure<br>Feed Water Temp<br>No off | | N/A |
| Exhaust Economiser | Type<br>Evaporation<br>No off | | N/A |
| Air Compressors (Main) | Type / Capacity | | MATSUBARA IRON WORKS<br>MH – 108 , 15 PS / 1150 RPM<br>25 Kg/CM2   (AUTO) |
| | No off | | |
| Air Compressors (Emergency) | Type | | YANMAR COMPRESSOR<br>NC 2 , 30 KGF/CM2    (MANUAL) |
| | No off | | |
| Fuel Oil Purifier | Type | | MITSUBISHI KAKOKI KAISHA LTD.<br>SJ – 10F   (MANUAL) |
| | No off | | |

Form 'C' – TBA                    2

|  | Capacity | 1900 L/H – 5.5 KW  9000 RPM |
|---|---|---|
| Lub Oil Purifier | Type | MITSUBISHI KAKOKI KAISHA LTD. SJ -10F (MANUAL) |
|  | No off |  |
|  | Capacity | 1900 L/H – 5.5 KW 9000 RPM |
| Evaporator | Type | ALFA LAVAL JWP – 26 - C80 |
|  | Capacity | 10 M3/24 HRS |
| Fresh Water Sterilizer | Type | NIPPON CONTROL CO.,LTD. L-N201 F , AC 100V / 60 Hz |
|  | Capacity | FLOW RATE : 2000 L/H |
| Fresh Water Mineraliser (FILTER) | Type / Capacity | NIPPON CONTROL CO.,LTD. L-B-L 3000 L |
| Waste Oil Incinerator (IMO MEPC 76 (40)) | Type | SUNFLAME CO.,LTD. OSV – 10 SA |
|  | Capacity | 10 X 10 4    KCAL  MJ/HR |
| Oily Water Separator | Type | TAIKO KIKAI / USC - 10 |
|  | Capacity | 1.0  M3/HR |
| Sewage Treatment plant | Type | TAIKO SHIP SEWAGE TREATMENT SBT  2S |
|  | Capacity |  |
| Hot Water Set (Calorifier unit) | No off | HARISON CO.,LTD , CFT – 500 – E 0.04 M3/MIN. TK CAP:500L 440V / 2S KW/60  Hz/3 PHASE  (AUTO) |
| Steering Gear | Type | TOKIMEC INC. JAPAN |
|  | Duty Capacity | 14.0 MPA |
|  | Hydraulic pump unit | 2 UNITS |

**Speed**
UP TO BEAUFORT SCALE 4, DOUGLAS SEA 3
About:  BALLAST : 13.0 KTS / LADEN : 13.0 KTS

**CONSUMPTION/ DAY**

|  |  | AT SEA | AT PORT |
|---|---|---|---|
| Main Engine | HFO | ABOUT 9.0 MT/DAY BALLAST ABOUT 9.5 MT/D LADEN | NIL |
| Auxiliary Engine | MGO | ABOUT  0.9 MT/DAY PLUS ABT 1.0 MT/D WHEN INERTING | IDLE/LOADING ABT 0.9 MT/DAY DISCH: ABT 1.5 MT/DAY |

| Permanent bunker capacity (100%) |  | Bunkering Filling Limits As Per GMS At 90% |  |
|---|---|---|---|
| HFO | : 416.81  M3 | HFO | 375.129 M3 |
| Diesel | : 89.37  M3 | Diesel | 80.433 M3 |
| Fresh Water | : 160.88  M3 |  |  |

**(B)   CARGO INSTALLATIONS**
1. **Transportable products and respective quantities, calculated in accordance with IMO – maximum filling formula. (Tonnes)**

|  | 100% (CBM) | 98% (CBM) |  |  |
|---|---|---|---|---|
| NO.1 CARGO TANK | 1756.75 | 1721.61 |  |  |
| NO.2 CARGO TANK | 1757.04 | 1721.9 |  |  |
| T O T A L | 3513.79 | 3443.51 |  |  |
|  | SPSV (bar g) | Ref. Temp. (deg. C.) | Density at (Ref. Temp.) | Corresponding Quantity (MT) |
| Propane | 17.65 | 53.8 | 0.443 | 1525.47 |
| Propylene | 17.65 | 45.4 | 0.468 | 1611.56 |
| B/P Mixture | 17.65 | 64.0 | 0.451 | 1553.02 |
| i-Butane | 6.86 | 52.0 | 0.516 | 1776.85 |
| N-Butane | 6.86 | 64.0 | 0.524 | 1804.40 |
| Butylenes | 6.86 | 56.5 | 0.545 | 1876.71 |
| Butadiene | 6.86 | 59.0 | 0.568 | 1955.91 |
| V.C.M. | 6.86 | 46.0 | 0.870 | 2500 |
| Isoprene | 6.86 | 106.0 | 0.684 | 2011.10 |
| Pentanes  (ALL ISOMERS) | 6.86 | 107.0 | 0.530 | 1825.06 |
| Pentene  (ALL ISOMERS) | 6.86 | 98.0 | 0.552 | 1900.81 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Note(1):** In case of USCG, propylene, propane and B/P mixtures are not to be carried except the vapour pressure of B/P mixtures is not more than 12.75 bar g, 13.0 kg/cm$^2$ @ 45 $^{\circ}$C
**Note(2):** On and after, the pressure value in parentheses is shown as a conversion value
Mixing ratio of above mentioned B/P mixtures is as follows:
Butane 35 wt% and propane 65 wt%

2. **Other transportable products     N/A**

|  | SPSV | Ref. Temp. ($^{\circ}$C.) | Density at Ref. Temp. | Corresponding Quantity (MT) |
|---|---|---|---|---|
| Raffinate 1 |  |  |  |  |
| Raffinate 2 |  |  |  |  |
| C4 |  |  |  |  |

3. **TANKS**
3.1    Design pressure (Vapour) – BV-IGC    :   **17.65 bar g (1.765 MPag)**
                                   - USCG    :   **12.75 bar g (1.275 MPag)**
3.2    Valve setting                             :   **17.65 bar g (1.765 MPag) / 12.75 bar g (1.275 MPag)**
3.3    Maximum vacuum obtainable           :   **Atmospheric**
3.5    Maximum temperature acceptable      :   **45 °C**
3.6    Minimum temperature acceptable      :   **0 °C**
3.7    Hydrostatic Test Pressure             :   **26.48 bar g (2.648 MPag)**

Form 'C' – TBA                                    4

4. LOADING RATE (TONS/HOUR) – For Full Cargo Parcels

| | | | |
|---|---|---|---|
| Ex-atmospheric storage with gas | : | 1 tank | : 360 t / HR |
| Return | | 2 tanks | : 360 t / HR |

Remarks:
* Based on maximum velocity of 6.5 metres/sec except VCM, and 4.0 meters/sec for VCM
  in the liquid piping.
* If cargo temperature is less than 0 °C, shore heater to be used. If ship heater used, max rate is **250 m$^3$**
  per hour.
* Loading by shore pump only, proper size gas return line to be connected
* Subject to both ship and shore tanks being under favourable conditions


5. CARGO PUMPS

| | | | |
|---|---|---|---|
| 5.1 | Type | : | **Deepwell / Centrifugal** |
| | Make | : | **Teikoku Machinery Works Ltd.** |
| | How many | : | **2 units** |
| | Maximum specific gravity | : | **0.948 (VCM) S.G. At   0 c** |
| | | | |
| 5.2 | Capacity (CMB/Hour) | : | **300 m3/Hr (LPG) / 250 m3/Hr (VCM)** |
| | Two speed or variable speed | : | **One Speed** |
| | Rated kW (each) | : | **120 Kw** |
| | Working pressure maximum | : | **20  Kg/CM2** |
| | | | |
| 5.3 | Location | : | **1 each cargo tank top** |
| | Removable | : | **no** |
| | | | |
| 5.4 | Booster pumps | : | **N/A** |
| | Type | : | |
| | Maker | : | |
| | | | |
| 5.5 | Capacity (CMB/Hour) | : | **N/A** |
| | Working pressure | : | |
| | | | |
| 5.6 | Location | : | **N/A** |

5.7  Time to discharge a full liquid cargo using all pumps against back pressure at pump

| | | | |
|---|---|---|---|
| | 1 bar | : | **about  hours for LPG = 6 HRS** |
| | 5 bars | : | **about  hours for LPG   = 8 HRS** |
| | 10 bars | : | **-------          = 12 HRS** |

| | | | |
|---|---|---|---|
| 5.8 | Nominal back pressure when working | : | **about 1 bar** |
| | In series corresponding head | : | **N/A** |
| | Maximum back pressure | : | **about 5 bar** |
| | Nominal pressure at rail (propane) | : | **about 13 bar at 20 degree C of cargo temperature** |

5.9  What amount of cargo remains in tanks after completion pumping before stripping:

| | | | |
|---|---|---|---|
| | - liquid | : | **about  per one tank = 0 Liquid** |
| | - vapour | : | **about  ton per one tank for LPG = 10 T** |

6. STRIPPING

| | | | |
|---|---|---|---|
| 6.1 | Stripping system, if any | : | **Nil** |

6.2  Time required to remove all traces of liquid cargo as stated in 5.9 for:

| | | | |
|---|---|---|---|
| | - LPG | : | **After disch of cargo tank is liquid free** |

Form 'C' – TBA                          5

## 7.  CARGO COMPRESSORS

| | | | |
|---|---|---|---|
| 7.1 | Type | : | Vertical 1-stage water cooled double acting |
| | Make | : | Tanabe Pneumatic Machinery Co.,Ltd. |
| | How many | : | 2 units |
| | Piston displacement | | 460  m3/H |
| | Rated Kw | | 75 Kw |
| | Stroke | | 177.8 mm |
| | Max discharge pressure | | 20  Kg/CM2 |
| | Pressure differential | | Normal 4.0 Kg/CM2 |
| | | | |
| | No of Revolutions | | 540  RPM |
| | | | |
| 7.2 | Are compressors oil free | : | YES |
| | | | |
| 7.3 | Can they reliquefy VCM without risk | : | N/A |
| | | | |
| 7.4 | State time to bring full cargo of butane to atmospheric pressure from 0.5 Bars | : | Approx. 2 Hrs |

## 8.  INERT GAS SYSTEM

| | | | |
|---|---|---|---|
| 8.1 | Does the vessel use inert gas? | : | Nitrogen Generator |
| | If so, state utilization and quantities | : | 200  m3/H |
| | | | |
| 8.2 | Can the vessel produce inert gas? | : | YES |
| | If so, state type and composition of gas produce:  99.90 N2 | | |
| | | | |
| | Discharge Capacity | | 200  m3/H |
| | | | |
| 8.3 | Maximum production obtainable | | 200 M3/H |

NOTE:- Above quantities obtained at engine room temperature 45° C

| | | | |
|---|---|---|---|
| 8.4 | State if there are storage facilities for inert gas onboard: N/A | | |
| | - Size | : | N/A |
| | - Pressure | : | N/A |
| | | | |
| 8.5 | State if any shore supply of nitrogen may be required: | : | N/A |
| | - for what purpose | : | N/A |
| | - what quantities | : | N/A |

## 9.  GAS FREEING

| | | | |
|---|---|---|---|
| 9.1 | State method used giving all details | : | Nitrogen Plant / Fans |
| 9.2 | State time required including stripping | : | TBA |

## 10.  CHANGING GRADE

10.1 From completion discharge of cargo Propane, time required in hours and inert gas in CBM required to reach a tank and gas installation atmosphere of less than 100 ppm of Propane in Vapour phase.

**Time required: TBA**

| | | | |
|---|---|---|---|
| 10.2 | Can this operation be carried out at sea? | : | YES |

10.3    Can the ship measure the number of ppm in vapour phase?    :    **YES**

10.4    Has vessel deck tank for changing grade/cooling operations?    :    **N/A**

10.5    Deck tanks                                      :              **NIL**
        Capacity                                       :
        Purpose                                        :

**11.   COOLING BEFORE LOADING**                       :    **N/A**

**12.   CARGO HEATER**                                      **N/A**
12.1    Type                                           :
12.2    Inside Diameter
12.3    Overall length
12.4    Cargo flow rate
12.5    Min Inlet Temp
12.6    Min Outlet Temp
12.7    Required Sea water Capacity
12.8    Design Pressure
12.9    Hydrostatic Test Pressure
12.10   Tightness Test Pressure

12.0    State discharging rate for propane to be brought from atmospheric pressure
        Loading rate for Propane – ° C / 0° C: **about**  300 Mt/hr

**13.   CARGO VAPORIZER**
        In case vapour gas is needed to feed compressors, can vessel produce its own if no shore
        available:
        **No**

**14.   REFRIGERATING APPARATUS**                          **NA**
14.1    Is it independent of cargo?                    :    **NA**
        Is so, state cooling agents                    :    **NA**

14.2    What minimum temperature can be maintained          :    **NA**

14.3    What time required at sea to lower by 1°C the full cargo of    :    **NA**

**15.   MEASURING APPARATUS**
        What gauges on board?
        Type                                           :    **Float type level gauge**
        Location                                       :    **At each cargo tank dome**

**16.   SAMPLES**
16.1    State how tank atmosphere samples can be taken and where from?

                                                            **Slip-tubes**
        Standard of fitting?                           :    **3/8 inch coupling**

16.2    Same question for cargo                        :    **TBA**

16.3    Are sample bottles available on board?         :    **No**

**17.   CARGO LINES**

17.1    Is ship fitted with a port and starboard cargo manifold?          :    **Yes**

17.2    Position of cargo manifold
        - distance from stern (AP)   (S / P)     :    **48.94**       **M**
        - distance form stem (FP)   (S / P)     :    **39.16**       **M**
        - height above deck                      :              **0.9**    **m for Liquid manifold**
        - distance from ship's rail              :    **2.3**        **M**
        - underside keel to manifold             :    **8**          **M**

17.3    Liquid line
                            - flange-size        :    **8  in.**
                            - type               :    **ANSI  300**

        Gas line
                            - flange-size        :    **5  in.**
                            - type               :    **ANSI  300**

17.4    What reducers on board?                  :
        **For Liquid line (low temperature)**
        **8X6 ; 8X5 ; 8X4 ; 8X3  inches**
        **For Vapor line (normal temp.)**
        **6X5 ; 4x5 ; 3x5  inches**

17.5    Is ship fitted with stern discharge?     **No**
        - Liquid line - diameter                 :    **N/A**
        - flange – size                          :    **N/A**
        - type                                   :    **N/A**

**18.  HOSES**
        Are serviceable hoses available on board?          :    **None**

18.1
        Length                                   :
        Diameter                                 :
        Flange-size                              :
        Type                                     :
        Bending radius                           :

18.2    Minimum temperature acceptable           :
        Maximum pressure acceptable              :

18.3    For what products are hoses suitable?              :

**19.  DERRICKS**
        - Hose cranes                            :    **YES**
        - Where situated                         :    **P/S Manifold**
        - Lifting capacity                       :    **0.9 T**
        - Working radius                         :    **4.0 M**

**20.  SPECIAL FACILITIES**
20.1    How many grades can be segregated?            :    **N/A**

20.2    How many cooled?                              :    **N/A**

20.3     Can vessel sail with slack cargo tanks?              :     **Yes**

## NOC VOYAGE C/P TERMS AND CONDITIONS
### APPLICABLE AS FROM 01/10/2001

### PART ONE

1.  Full vessel's details as described.
2.  Last 3 cargoes/charterers.
3.  Vessel's current position and her ETA basis intended loading port.
4.  Cargo size for minimum metric tons one/two grades, within vessel's natural segregation crude and/or dirty petroleum products or clean petroleum products.
5.  Charterer's option up to full cargo overage at 50% of agreed rate. No deadfreight Charterer's account provided minimum supplied.
6.  Loading:  one/two safe berth/ports ................
7.  Discharging one/two safe berths/ports
8.  Laycan ..........
9.  Freight rate Worldscale ..........
    Basis min/max ........ Tons
    Freight, deadfreight, deviation and demurrage will be paid in Euro or Swiss Francs.  The U.S. Dollar/Euro/ Swiss Francs rates of exchange shall be as Reuter's page FXFX prevailing on 11.00 hours London time the second banking day prior to payment date.
10. Demurrage on Bill of Lading quantity.
11. Laytime (seventy-two) 72 hours shinc.

### PART TWO

1  Asba tank Voyage C/P Form to apply.

2  York/Antwerp rules 1974 shall apply.

3  Revised P & I Clause 1987 as attached, shall apply.

4  All terms and conditions of the new worldwide tanker nominal freight scale to apply to this Charter.

5  Owner's warrant that the vessel is not blacklisted by the Arab League.

6  General average/arbitration, London.  English Law shall apply.

7  No freight is payable on slops, sludge or sediments.  Slops to be kept fully segregated.

8  Vessel to arrive loading port with clean ballast.

9   Owner's warrant vessel is capable of discharging full cargo within 24 hours or maintaining 100 psi at ship's rail while discharging, provided shore facilities permit.  If the vessel fails to maintain this discharge rate, charterers shall not be responsible for any Laytime or demurrage caused by such failure should it become necessary to withdraw the vessel from berth because of it's failure to maintain the discharge rate, all time and expenses incurred are to be owner's account.  If the shore facilities do not permit discharge within the agreed time, then the Master is to issue a letter of protest to the cargo receivers and to advise charterers through vessels agents/owners before vessel sails discharge port(s). Letter of protest is to be countersigned by receivers and attached with owners demurrage claim if any.  Failing such protest by Master, Charterers will deduct excess pumping time over the warranted period.

10   Whenever Owners are instructed to deliver cargo without presentation of original Bills of Lading or at another destination other than that shown on the Bill of Lading issued for the cargo, the following will apply:

Owners undertake to instruct Master to discharge entire cargo upon Charterer's instructions with 1/3 original Bill of Lading on board, if not an LOI is required then same to be in accordance with Owner's P&I Club wording (s) signed by an authorized officer of (N.O.C.) by telex but with no bank guarantee.

11   Notice of Readiness to be tendered within 06.60 hours and 16.00 hours.

12   If the vessel arrives at designated loading port(s) prior to agreed Laydays, Notice of Readiness shall be tendered at 06.00 hours of initiative day of agreed Laydays.  If Charterers allow vessel to load prior to agreed Laydays, time not to count until 0.600 hours on the first day of Laydays.

13   Six (6) hours notice is always due even if vessel is already on demurrage.

14   First shifting at all ports, from anchorage to berth and deballasting time never to count as used Laytime.

15   Any delays due to weather conditions at loading and discharging ports) shall count a one half Laytime, or if on demurrage as one half of demurrage rate.

16   Owner's agree to instruct Master to provide required E.T.A.'s as requested by Charterers.  Any time lost and/or delays and/or cost resulting from failure to comply with Charterer's instructions, will be for owner's account and time so lost, will not count a Laytime or demurrage, even if vessel is already on demurrage.

17   Owners shall appoint agents nominated by Charterer at both loading and discharging port(s).

18  Charterer's inspector has the right to gauge vessel's bunker tanks prior to and after both loading and discharging.

19  Demurrage, if any, once substantiated, shall be paid by Charterers within three months from receipt of owner's claim against owner's original invoice supported by:

> Notice of Readiness and statement of facts from loading and discharging port(s), duly signed by the Master, Shippers, Receivers and Agents respectively.

> Any claim for demurrage and/or deadfreight shall be presented to Charterers within 3 (three) months from date of completion of discharge, otherwise claims will not be honored by Charterers.

20  Vessel to arrive at Loadport with all cargo tanks, pipes and pumps suitably clean to Charterer's inspectors satisfaction in accordance with Clause 16A of this Charter Party and further Owners to ensure that all traces of sediments, tank washings or chemicals, if used, are removed from tanks, pumps and pipes intended for carriage of designated cargo. Any delays as a result of vessel arriving at Loadport and not being in a suitable condition to load designated cargo to be for Owner's account and time used not to count as Laytime.

But should after 36 thirty six) hours of further cleaning, vessel still not clean to Charterer's inspector's satisfaction, Charterers shall have the right and option to cancel the vessel and declare this Charter Party null and void.

21  Owner's guarantee that vessel is fully fitted with heating coils in all cargo tanks and agree to instruct the Master to heat the cargo, if required by the Charterer up to the maximum temperature of 135 (one hundred and thirty five) degrees Fahrenheit.

If vessel fails to maintain the temperature required, the Owner shall be responsible for any resulting delay and time lost thereby shall not count as Laytime or time on demurrage, even if vessel is already on demurrage.

Should it become necessary to draw the vessel from berth because of Owner's failure to maintain the required temperature, all time and expense to be for Owner's account.

22  Owner's warrant that the vessel carries on board certifications of compliance with the latest IMO/MARPOL Regulations and any other record of documentation as may be required by Government authorities

or port authorities for any port of loading and discharging areas as described.

Any delay, losses, expenses or damages arising as a result of failure to comply with this clause shall be for Owner's account.

23     Owner's warrant that the crude oil washing system is in full working condition.  If requested by Charterers, Owners agree to conduct crude oil washing of all cargo tanks at discharging port(s) simultaneously with cargo discharge operations.  Time for crude oil washing operation shall not exceed 6 (six) hours at Charterer's expense which shall be constituted as consumed Laytime.  For this purpose vessel shall clearly document the time when such operation has been executed.

24     Owner's warrant that the inert gas system is in full working condition.

When vessel's cargo compartments are inerted, Master may be requested by terminal personnel for independent inspectors to depressurize those tanks for the purpose of gauging, sampling temperature, determination and/or determining the quality of cargo on board.  Such time for Charterer's account.

Master shall comply with these requests commensurate with safety.

Inert gas system operations shall always be in conformity with all latest safety and security regulations and follow the recommendations given by IMO.

25     Owner's warrant the vessel is fitted with derrick min capacity of 10 tons and in full working conditions to lift floating cargo hoses to ship manifold during loading and/or discharging.

26     Owner's warrant vessel has on board a valid certificate as required by article VII of the international on civil liability for oil pollution of 1969, as amended by charterers and shall not be liable for any demurrage for delays, expenses of damages resulting from non-compliance.

27     Owners shall ensure that the Master and Crew exercise due diligence in complying with Charterer's orders relating to loading and/or discharging and care of cargo generally.

28     ISM Clause.  Owners guarantees that vessel complies fully with the ISM Code and is in possession of a valid safety management certificate and will remain so for the entirety of her employment under this Charter Party.   Owners will provide Charterer with satisfactory evidence of compliance if required to do so and will remain fully responsible for any

and all consequences arising directly or indirectly from any matters arising in connection with this vessel and the ISM Code.

29      If required by charterers, Owners agree that vessel will perform a vessel to vessel lighterage operation at seas at a safe location other than the customary anchorage for the discharge port(s) in which event, Charterers will provide lighterage vessel. Mooring master, fenders, hoses and all other equipment necessary for a safe operation.

30      Vessel shall comply with I.T.F. regulations or equivalent shall remain in compliance for the duration of this Charter.

31      Owner' warrant that the vessel performing under this Charter Party carries on board a certificate of financial responsibility meeting the requirements of the U.S. Federal Maritime Commission Promulgated Pursuents to the Federal Water Pollution Control Act, as amended, as well as the certificate of insurance required under the Civil Liability Convention for Oil Pollution Liability.

32      Owner's warrant that vessel complies with provisions of the U.S. Coast Guard Regulations for Federal Water Control Act Sections 154, 155, 156 and Title 33 CFR Code for Federal Regulations, as amended, and any delay to the vessel as a result of failure to comply with this clause shall be for Owner's account.

33      Vessel to comply with the requirements of the U.S.A. Port and Tanker Safety Act 1987. The Owners shall also be obliged at their sole time and expense to obtain the necessary certificates of compliance with above or appropriate waivers arranged prior to discharge. Should Owners fail for any reason whatsoever to obtain certificate of compliance or appropriate waivers thereof prior to arrival at discharge port(s), all costs, time, delays, expenses and damage consequential or otherwise whatsoever, shall be for Owner's account. Without limitation, these shall include any costs for transshipping, lightening and barging etc., and all time incurred therein.

Any time lost due as a result of Owner's failure to comply with this clause shall not count as used Laytime neither as demurrage even if vessel is on demurrage. Any time lost to be for Owner's account.

34      In the event any cargo remains on board upon completion of discharge, Charterers shall have the right to deduct from freight an amount equal to F. O. B. Port of Loading value of such cargo plus freight due with respect there to provided that the volume of cargo remaining on board is pumpable (as determined by the appointed Charterers independent inspectors as "liquid" or "free flowing" by ship's pumps or not pumpable occasioned to vessel's equipment failure as ascertained by the independent inspector.

35     Charterers have liberty to instruct vessel to wait at load or discharge port, time so used to count as used Laytime or demurrage if vessel on demurrage.  Owner agrees that all claims involving time lost by vessel as otherwise herein defined in this Charter Party or beyond the apparent scope of the Charter Party to be initially liquidated as Laytime to the extend that Laytime still remains or as demurrage in the event vessel on demurrage.

36     Clingage Clause:  (When vessel ex dry-dock or ex lay-up of ex dry cargo).

Owner and Charterers recognize that vessel being ex lay-up, ex dry-dock or ex drt-cargo, a clinage or a greater degree than normal can be anticipated.  Therefore value of crude as well as freight for any short outturn cargo quantity (as determined by two independent surveyors one appointed by and paid by each party, by comparing the Fill of Lading quantity with the quantity actually discharged ashore on the basis of shore tank gauges) shall be deducted from freight to the extent that such quantity exceed 0.5 pct of the Bill of Lading quantity.

37     In the vent vessel's sailing Loadport delayed by more than (4) four hours from completion hoses disconnected Charterers to contribute to said delay beyond four hours to the extent that time lost due to awaiting cargo documents.  This clause is applicable where delay beyond four hours is solely attributable to awaiting cargo documents.

38     If the vessel is fixed for more than one voyage, the other (s) being direct continuation of the first voyage, the total Laytime accrued due to the number of voyages performed shall be assignable and deductible from the total amount of time used in performing the voyages.

Such that if on any voyage under this Charter Party demurrage, detention or deviation arises, such time shall be liquidated/reduced by any unused Laytime saved on any other voyage until all the accumulated Laytime for the total number of voyages performed has been consumed.

39     An address commission of 2.50/1.25 per cent is payable to Charterers on freight, deadfreight, deviations and demurrage. Charterers are at liberty to deduct this commission prior to remittance of funds.

40     Negotiations and/or and eventual fixture to be kept strictly private and confidential by all parties concerned.

41     Additional Clauses

The following terms and conditions to be applied for all vessels calling for loading and/or discharging at Saras Refinery.

1.1     Vessel's size and restrictions for discharge crude oil:

- 260,000 tons deadweight maximum
- 67 feet draft maximum
- 360 meters overall length maximum
- 180 meters maximum each way, from the centre manifold to the bow and to the stern
- height between vessel's manifold and sea level 21.5 meters maximum

In the case of a vessel supplying a part-cargo, the sailing draft shall not exceed 44 feet.

1.2     Vessel's size and restrictions for loading products;

40,000 tons deadweight maximum
105 metres maximum, each way, from the centre manifold to the bow and to the stern.
Height between vessel's manifold and sea level 13.5 metres maximum

65,000 tons deadweight maximum
Arrival draft 11.4 meters maximum
Sailing draft 12.2 meters maximum
115 meters maximum, each way, from the centre manifold to the bow and to the stern.
Height between vessel's manifold and sea level 13.5 meters maximum
Moulded depth 17.0 meters maximum

1.3     For vessels loading LPG the following restrictions:

4,000 metric tons deadweight maximum
Sailing draft 6.7 meters maximum
Distance between bow and stern to centre manifold 50 meters maximum, each way.
Height between vessel's manifold and sea level 7.8 meters maximum at all times.
Moulded depth 17.0 meters maximum

In principle, a vessel's manifold should be amidships.

1.4     All vessels arriving at Sarroch must have their own gangway on board which should be a minimum of 12 meters in length.

1.5     For all vessels calling at the refinery, passage through the Strait of Bonifacio (Bocche de Bonifacio) is prohibited.

1.6     Owner's warrant that they are familiar with the latest vessel size restrictions, including but not limited to, deadweight, draught, beam and overall length limitations of the discharging port and will not nominate a vessel exceeding or otherwise not complying with such limitations.

1.7     Owner's warrant that vessel is strictly comply with all applicable regulations in force at the discharging port, including but not limited to, those relating to fires on board vessels.

1.8     Owner's warrant that vessel is strictly comply with all applicable rules, regulations and directions of Governmental, Local and Port Authorities, and of the discharging terminal, at the time of delivery and shall conform in all respects to all relevant international regulations and agreements then in force.

        Have hull, machinery, boilers, tanks, equipment and facilities which are in good order and condition, in every way fit for the service required and fit to carry and discharge the cargo specified and have a full and efficient compliment of Master. Officers and Crew.

1.9     Owner's warrant that vessel nominated under this Agreement carry on board a valid Certificate of Insurance as described in the Civil Liability Convention for Oil Pollution Damage for the entire cargo, and the vessel has in place, and will maintain, insurance cover for oil pollution through a reputable P&I Club member of the International Group of P&I Clubs or has in place an equivalent insurance cover no less in scope and amounts than available under the rules of such international group of P&I Clubs.

1.10    Owner's warrant that vessel shall be comply with:

        I       The standard set out in "ISGOTT"
        II      Comply with appropriate IMO recommendations, and
        III     Comply with the "OCIMF" guidelines for the control of drugs and alcohol on board ship (1990), each as amended from time to time.

1.11    All vessels arriving at Sarroch must have their own gangway on board which should be a minimum of 12 meters in length/

1.12   100 percent of a vessel's maximum cargo tank volume, whether utilized or not, will be used to determine if a vessel conforms to the Jetty limitations.

In the case of vessels with multiple deadweight certification, the maximum deadweight certification on which the vessel is allowed to trade will be used to determine if a vessel conforms to the jetty restrictions. In the case of vessels which have been re-measured either the original deadweight or the current trading deadweight, whichever is the greater, will be used to determine if a vessel conforms to the jetty restrictions.

1.13   In the event that the nominated vessel cannot berth at the refinery because it does not conform to the maritime restrictions, as defined herein, then all costs and consequences will be for the Owner's account.

1.14   Discharge of dirty ballast, bilges, slops or other substances in the sea shall be in accordance with MARPOL 73/78, as amended from time to time, and is in any event totally prohibited within the confines of the loading terminal and Owners shall be liable for the consequences of any failure of its nominated tankship to comply with the provisions of this sub-section. The discharge of dirty ballast ashore is permitted but acceptance of such ballast is at Saras' sole option. However, Saras will not refuse to accept ballast unreasonably. Vessels must have completed the discharge of dirty ballast prior to the loading of cargo while still conforming to the jetty restrictions. At the discretion of the harbour Authorities, vessels with a fully segregated ballast system may be allowed to discharge clean ballast into the sea.

Vessels without a segregated ballast system may also be allowed to discharge clean ballast into the sea, but only after the harbor authorities have inspected the system and authorized such ballasting operation. In either case, it is to be understood that any such authorization does not constitute an acceptance of any liability on the part of harbour authorities in respect of the deballasting operation. In the event that a vessel is not cleared to deballast ashore, Saras and/or NOC do not accept any responsibility for the consequences of a vessel not being allowed to deballast into the sea. The concurrent discharge of clean ballast ashore or at sea and the loading of cargo is not allowed. Vessels must conform to the jetty restrictions at all times during deballasting operation. All time, including inspection by and authorization from the harbour authorities and cost associated with the deballasting operation are for owner's account.

EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NORTHERN YIELD SHIPPING LIMITED,                      :
                                                      :
              Plaintiff,                              :
       vs.                                            :        13 CV
                                                      :
NATIONAL OIL CORPORATION,                             :        **ATTORNEY**
                                                      :        **DECLARATION THAT**
                                                      :        **DEFENDANT CANNOT**
              Defendant.                              :        **BE FOUND IN THE**
                                                      :        **DISTRICT**
                                                      :
------------------------------------------------------------------X

      This Declaration is executed by Katherine N. Christodoulatos, counsel for Plaintiff, NORTHERN YIELD SHIPPING LIMITED, in order to secure the issuance of a Summons and Process of Maritime Attachment and Garnishment in the above-captioned Admiralty Cause.

      Pursuant to 28 U.S.C. §1746, Katherine N. Christodoulatos, declares under the penalty of perjury:

      I am an associate of CHALOS & CO, P.C., attorneys for Plaintiff in the above-referenced matter.

      I am familiar with the circumstances of the Complaint, and I submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the Defendant, NATIONAL OIL CORPORATION pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

      I have personally inquired or have directed inquiries into the presence of the Defendant in this District.

1

I have directed attorneys in my firm to check with the office of the New York Secretary of State, using the Secretary of State's database, and have determined that, as of January 24, 2013, the Defendant is neither incorporated nor registered as a foreign corporation pursuant to the laws of New York, and has neither nominated nor appointed any agent for the service of process within the State.

I have directed attorneys in my firm to engage a search of the Superpages telephone directory on the internet, and determined that there are no telephone listings or addresses for the Defendant within this District.

I have directed attorneys in my firm to engage in a Google search as to whether the Defendant can be located within this District and determined that there is no telephone listing or address for the Defendant within this District.

I am unaware of any general or managing agent(s) of the named Defendant within this District.

In that I have been able to determine that the Defendant has not appointed an agent for service of process within the state of New York and that I have found no indication that the Defendant can be found within this District for the purposes of Rule B, I have formed a good faith belief based on the investigation of the attorneys under my direction that the Defendant does not have sufficient contacts or business activities within this District and does not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon an investigation performed by attorneys in my firm under my direction that, the Defendant cannot be found within this District for the purposes of Rule B of

2

the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil

Procedure.

Dated: Oyster Bay, New York
       January 24, 2013

                                         CHALOS & CO, P.C.
                                         Attorneys for Plaintiff
                                         NORTHERN YIELD SHIPPING LIMITED

By:     _____
                                           Katherine N. Christodoulatos (KC-1226)
                                         55 Hamilton Avenue
                                         Oyster Bay, New York 11771
                                         Tel: (516) 714-4300
                                         Fax: (516) 750-9051
                                         Email: kchristodoulatos@chaloslaw.com

EXHIBIT 3

## The Libya Herald wishes its readers a very happy New Year

| ABOUT US | ADVERTISING | CONTACT | LIBYA GUIDE | BLOGS/WEBSITES | JOBS & CLASSIFIEDS | LETTERS | TENDERS | LAWS | FAIRS & SEMINARS |

### NOC Chairman says 1.5m b/d by mid-March, 1.6m by mid June: Exclusive interview

*Tripoli 10 March:  In the week that Libya's National Oil Corporation (NOC) announced that oil production had reached 1.4 million b/d — just two million b/d short of its pre-17 February Revolution levels and in the record time of about four months since Libya declared its Liberation — the Libya Herald's Sami Zaptia was able to secure an extensive and exclusive interview with the NOC chairman, Dr Nuri Buruwin.*



NOC chairman Dr Nuri Buruwin

• I started by asking what had been the cause of the rapid increase in production.

"The spirit and the cause have been the reasons for this rapid increase. The Libyan workers had no reason for working before but now they have a free Libya and the benefit of its people. They have been working in the severest and harshest conditions and they have done an excellent job. Worldwide, many analysts were not expecting that we would reach these production levels. The workers have done an excellent job and I would like to take this opportunity to thank them again.

"These young people, had they not been in the oilfields, would have been fighting. It's the same spirit. They know that they are doing it for the Libyan people. They are not doing it for Qaddafi or anybody else."

• Libya consumes a certain percentage of its oil production and exports the rest. Another percentage of exports is also imported as finished goods to make up the gap between local production capacity and Libya's actual consumption. It is the revenue accrued from the balance of those excess exports that give Libya its wealth and power. I asked the NOC chairman the rate of oil exports at present.

"All Libya's local refineries are in operation except for Ras Lanuf. The refineries that are working are doing so at full capacity at the moment. Zawiya is refining about 120,000 b/d, Tobruk 20,000, Sarir 10,000 and Brega about 9,000 b/d – which totals about 160,000 for local refineries.

"About 9-10 percent of our oil production goes to our partners for their share. The rest is exported for the benefit of the NOC and the Libyan people."

• During Libya's popular revolution, the UN Security Council froze all the Libyan state's overseas accounts, including those used by the NOC. I therefore enquired if the oil revenues currently coming into NOC accounts were post-17 February NOC accounts that the NOC had full access to and control of.

"The mechanism is like this. We receive the money within a month — plus or minus — after the cargo has been received by the buyer at the terminals. We receive the money in our accounts with the Libyan Foreign Bank. Then automatically within two days, it is transferred to the Central Bank of Libya. At NOC we have no access to that money. We receive our cash from the Finance Treasury Department just like any other sector. We have no control over the money."

• I then raised an issue of great interest to the Libyan public with the NOC head. Many Libyans cannot understand how, on the one hand, they hear that oil production has reached 1.4 million b/d, with crude oil prices well over $ 100 a barrel. Yet on the other hand, there is no liquidity in the Libyan economy. The NTC and government have not released a detailed budget. I pressed Dr Buruwin about the speed of payment of NOC revenues and whether some of Libya's oil money was being held abroad or if it were being used to pay allies who helped Libya in the Revolution, for example. Were there any problems with payment for oil to the NOC from foreign buyers?

"Libya is getting paid by the mechanism which I have explained," he stressed. "We have no problems with collection of payment. If there is any delay in payment, we are paid penalties by the buyers."

• Looking forward, I asked the NOC chairman what the projected rate of oil production would be in the coming months.

"We expect a big jump within 15 days or so and maybe by the middle of the March we will see a figure of 1.5 million b/d. Then, we will start increasing production little by little because we have some problems here and there and have some pipelines that need repairs. We are working on these. These pipelines account for either 30,000 b/d here or 40,000 b/d there. We are working to have everything in proper order.

"Waha [Oil Company] is coming up strong. They are very near their target. AGOCO have some problems that they are working on. Once they have solved these problems, we will see a big jump. And accordingly we will be ready to send crude to Ras Lanuf refinery from the Misla and Sarir fields. The problem is the big transformer. This was damaged by the Qaddafi forces during their first attack on Misla field. It is being installed by the company

itself. No outside contractor is involved."

• But what kind of production figures could Libya reach in the not so distant future?

"We can get 1.6 mbd by June. Our target this year is to go back to normalcy of 1.7 mbd plus by the end of the year, because these pipelines, we hope, will be finished by the end of the year. These production figures do not include condensates of about 60-70,000 b/d."

• What is the new production target? What could the infrastructure handle and what is achievable? Is there a policy target?

"We expect next year there will be a jump in production because we have some development projects that stopped. They will be coming on one by one by 2013. This is because there are some prior commitments. For some of these projects we have already opened letters of credit and they are already being used.

"This production will help maintain the level of production as the Minister said; we are aiming to increase our production to two million barrels a day by 2014. I think this is easily achievable."

• Is it a policy for Libya to continue to increase oil and gas production? Is there an optimum target? Is there a policy to preserve oil reserves?

"My personal opinion is that are we going to utilize and invest this money wisely. If we are going to invest the revenues from the oil correctly, then we go ahead and concentrate on getting it out – but if we are not ready, we just have to leave it a little bit until we are ready; otherwise we produce it and eat it and that's not the right thing. If we are competent and capable of investing it better than just leaving it in the ground, then we should increase production."

• Has this production rate of 1.4 m b/d been achieved purely with Libyan manpower?

"It started with 100-percent Libyan manpower maybe onshore. Start-up of production during the difficult times was done by a 100-percent Libyan workforce. Offshore, our partners helped us get the platforms back in production. But that does not contribute much to production. For oil that contributes about 80,000 b/d. The gas which is being exported to Europe has been produced with help from our partners. More than 90 percent has been done by a Libyan workforce. Onshore close to 100 percent of production is being achieved with a Libyan workforce."

• Can Libyans continue to produce without the need for a big number of expats in the oil and gas sector?

"There are activities in which we will need the help of some foreign experts, especially in the area of gas and also probably the petrochemical side. But the percentage is not that great. Roughly speaking out of 45,000 there are only about 2,000 expats. The foreign workforce has been on the decline."

"We are at the point now where we need the service companies in order to sustain production, and some of these drilling, servicing and work-over companies use expat labour. The majority of these servicing and work-over companies are Libyan companies using a Libyan workforce.

"During the liberation war, a lot of spare parts and equipment was damaged, destroyed, stolen or lost. It is very important now that once our budget is approved – which we expect to happen very soon — we start getting spare parts and key components so that we can sustain production such as in power plants, etc. Because there are critical elements of production that we need to make sure that we have the spare parts for — more than the workforce. That is what we are working on in the next phase."

• Dr Mahmoud Jibril, the former prime minister, said that Libya had used about two-thirds of its proven oil reserves. Do you agree with that?

"Of the *proven* ultimate reserves, probably about two-thirds have been produced. But this reserve figure is a changing, dynamic one. Every year we have been adding more reserves than we produced. So if we carry a figure, that figure has been constant for a long time. Then we produced for years, yet the reserve figures stays constant. I will give you an example, ten years ago our reserves were a certain figure, and then we produced for 10 years and now the figures are much more than they were 10 years ago. These are the reserves.

"On the other hand, there is the matter of recovery. I respect Dr Jibril's opinion, but there may be some details he is not aware of. Our ultimate recovery rate is very low. We carry about 33 percent. But because of the quality of our reserves, we could add more by implementing improved techniques such as better oil recovery, by good reservoir management, by enhanced oil recovery etc.

"For example, we could add from 5 to 10 percent. If we add 10 percent for example in the next few years, this means with the current levels there will be another 20 years of production.

"We are working on that. We are going to do it. Our young people are working on that and they are going to do it. We are going to increase production not just by exploration but also by developing the current reserves and these reserves and our large reservoirs are amenable to the applicable methods that have been used worldwide. Therefore our target is to increase reserves."

• There has been much talk of corruption in Libyan government institutions and the post-17 February authorities have promised transparency in the Transitional Constitution. I asked the NOC head if there were transparency in the tender/procurement process of the NOC at present and what specific measures were being taken in order to improve transparency.

"What I see in the future — and not just in the oil sector — is that we must have the private sector very active; otherwise we are going to have a lot of problems. The government cannot do everything. We cannot employ everybody. We expect the private sector to be so big and important that it will take care of a big portion of the economy. We will encourage the private sector. One of the conditions that hopefully will be used is that companies that employ a larger Libyan element will have a privilege. Otherwise if it is companies using agencies, I don't think this would be wise.

"We have been talking about how to improve transparency. For example, by giving the companies instructions on how to go about bidding. First, one of the things that some of the oil companies do is to announce the tenders on the internet, but they don't give enough time for some companies to bid. So we are suggesting that they give at least 30 days so that you give a chance to everyone to participate. Also, they have to adapt the pre-qualification process. They have to encourage the private sector and I expect at least in projects that are not that sophisticated that more companies will participate."

NOC Chairman says 1.5m b/d by mid-March, 1.6m by mid June: Excl...        http://www.libyaherald.com/2012/03/10/noc-chairman-says-1-5m-bd-...

• A group of Libyan companies informed me that they were forming a Libyan procurement companies' association in order to put pressure on the NOC to give more of its big orders to local companies. What is your comment on this?

"We welcome it but only as long as everything is done transparently and competitively. If they are competitive, then why not? It takes two to tango. I would advise the private sector to be transparent."

.12.   The NGO, the Extractive Industries Transparency Initiative (EITI), participated in the Libya Transparency Roundtable in Tripoli in December, to which I was invited. EITI encourages this initiative, signed up to by the USA, whereby for better transparency, national oil corporations reveal their exploration and production contracts with their foreign partners. What is your comment on this?

"I talked to them and told them that usually you have some contracts that have some secret terms. But, if the second party or the other signatory would like to publish, we don't mind. They should not, but they may have. If they don't mind, we don't mind.

"If you go to our NOC website, every thing that we sell is published. In terms of the type of crude, the destination, the quantities and also the pricing.  Anybody can sit down and with the Brent price and work out what we sold and at what price. This was never the case in the past.'

• Do you feel that it is right or fair that the NOC is given a role as a national employer and is expected to solve the Libyan government's unemployment problems?

"The NOC advertises on our site asking for new graduates, targeting subjects relevant to our needs. We usually take about 1000 graduates every year. You know the quality of our education system is poor. Therefore, we try to do some upgrading. For one year we give them some subject and foundation programmes, and then at the end of the programme, they are assigned to different oil companies. They receive some payment during this programme.

"We have been doing this in the past and we will continue to do it. Our young people need work. This seems to be a popular place for people to want to work. Some of the companies to which we assigned some workers complain that they don't have work for them. We are over-populated.

"Anyway, we are going ahead in the hope that in the future the activities of exploration and production will increase and therefore there will be room for everybody. We hope for the expansion of our downstream sector. Also as we said earlier, we hope the private sector will pick up very quickly in order to take up the slack."

Tweet ⸱ 0

EXHIBIT 4

Libyan Arab Foreign Bank - Correspondents

http://lfbank.ly/english/index.php?option=com_content&task=view&...



Arabic

LIBYAN FOREIGN BANK

Home     About the Bank     Products & Services     Participations     News     Correspondents          search...

**THE ANNUOL REPORTS**

- Annual Report 2008
- Annual Report 2009
- Annual Report 2010

## Correspondents

| institution | City |
| --- | --- |
| The Royal Bank of Scotland NV | Amsterdam |
| National Bank of Greece SA | Athens |
| ING Belgium SA/NV | Brussels |
| Danske Bank A/S | Copenhagen |
| ABC International Bank plc | Frankfurt am Main |
| Commerzbank AG | |
| Deutsche Bank AG | |
| BNP Paribas (Suisse) SA | Geneva |
| Arab Turkish Bank | Istanbul |
| ABC International Bank plc | London |
| British Arab Commercial Bank plc | |
| Aresbank SA | Madrid |
| Arab Banking Corporation (BSC) | Manama |
| UniCredit SpA | Milan |

**THE FINANCIAL STATEMENTS**

- Balance Sheet 2007
- Income Statement 2007
- Balance Sheet 2008
- Income Statement 2008
- Balance Sheet 2009
- Income Statement 2009

Libyan Arab Foreign Bank - Correspondents                    http://lfbank.ly/english/index.php?option=com_content&task=view&...

| | |
|---|---|
| Crédit Foncier de Monaco | Monaco |
| State Bank of India | Mumbai |
| JPMorgan Chase Bank National Association | New York |
| BNP Paribas SA | Paris |
| BANCA UBAE SpA | Rome |
| Korea Exchange Bank | Seoul |
| Bank of Valletta plc | Sliema |
| Svenska Handelsbanken AB (publ) | Stockholm |
| The Bank of Tokyo-Mitsubishi UFJ Ltd | Tokyo |
| UniCredit Bank Austria AG | Vienna |
| Credit Suisse AG | Zürich |

**Documents and Forms    Contact us    Releated Sites    Participations**